AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Northern District of New York

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )          Case No. 5:18-MJ-468 (TWD)
information associated with the Facebook user name )
https://www.facebook.com/lindasue/parnell that is stored )
at premises controlled by Facebook, Inc., as more fully )
described in attachment A.

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
information associated with the Facebook user name https://www.facebook.com/lindasue/parnell that is stored at premises controlled by Facebook, Inc., as more fully described in attachment A.

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:
See attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 641 | Embezzlement of Public Money, Property or Records |
| 18 U.S.C. § 1343 | Fraud by Wire, Radio or Television |

The application is based on these facts:
See affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Douglas Herbert, Special Agent, VAOIG
*Printed name and title*

Sworn to before me and signed in my presence.

Date: Aug 17, 2018

_____
*Judge's signature*

City and state: Syracuse, New York

Hon. Thérèse Wiley Dancks, U.S. Magistratge Judge
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook username https://www.facebook.com/lindasue.parnell (hereinafter, the "User") that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

**I.    Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), this warrant requires Facebook to disclose the following information to the government for the User listed in Attachment A:

(a)    All contact and personal identifying information, including the User's full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)    All activity logs for the account and all other documents showing the User's posts and other Facebook activities;

(c)    All photos and videos uploaded by the User and all photos and videos uploaded by any user that have that the User tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos,

(d)    All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the User is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments;

gifts; pokes; tags; and information about the User's access and use of Facebook applications;

(e)    All other records of communications and messages made or received by the User, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f)    All "check ins" and other location information;

(g)    All IP logs, including all records of the IP addresses that logged into the account;

(h)    All records of the User account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the User has "liked";

(i)    All information about the Facebook pages that the User's account is or was a "fan" of;

(j)    All past and present lists of friends created by the User's account;

(k)    All records of Facebook searches performed by the User's account;

(l)    All information about the User's access and use of Facebook Marketplace;

(m)    The types of service utilized by the User;

(n)    The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o)    All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the User's account;

(p)     All records pertaining to communications between Facebook and any person regarding the User or the User's Facebook account, including contacts with support services and records of actions taken.

## II.     Information to be seized by the government:

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, Section 1343 and Title 18, United States Code, Section 641 involving the User from 01/01/2010 to the present, including information pertaining to the following matters:

(a) Information pertaining to the location and whereabouts of the User from 01/01/2010 to present, including evidence indicating how and when the User's Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(b) Information supporting and/or calling into question statements made by PARNELL to law enforcement when asked about her filing OWCP claims, including information regarding: PARNELL's income and travel activities.

(c) Evidence indicating the User's state of mind as it relates to the crime under investigation; AND

(d) The identity of the person(s) who created and/or used the User account and/or username, including records that help reveal the whereabouts of such person(s).

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USERNAME https://www.facebook.com/lindasue.parnell THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK, INC. | Case No. _____<br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Douglas Herbert, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application for a search warrant for information associated with a Facebook account associated with username https://www.facebook.com/lindasue.parnell that is stored at premises owned, maintained, controlled, or operated by Facebook, Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California, as more fully described in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the username https://www.facebook.com/lindasue.parnell, as described more particularly in Attachment A, for the records and information described more particularly in Attachment B.

2.     I am a Special Agent with the Department of Veterans Affairs, Office of Inspector General (VAOIG), and have been employed as a Special Agent with the United States Government since 2009. In my current position at VAOIG, my duties include investigation of thefts of government property and fraud, among other matters.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and from documentary evidence. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Section 1343 and Title 18, United States Code, Section 641 have been committed by LINDA SUE PARNELL (PARNELL).  There is also probable cause to search the information described in Attachment for evidence of these crimes, as described in Attachment B.

## PROBABLE CAUSE

5.      On or about December 3, 1995, PARNELL, while working as a nurse at Veterans Affairs Medical Center, Syracuse, NY (VAMC Syracuse), reported an injury to her back while assisting a patient.  PARNELL submitted a claim for her reported injury to the U.S. Department of Labor Office of Workers' Compensation Programs (OWCP) and was found to be compensable.

6.      As part of her OWCP compensation, PARNELL was authorized reimbursement for medical and rehabilitative expenses including travel.  Specifically, PARNELL was authorized by OWCP to obtain membership to the Young Men's Christian Association (YMCA) of Greater Syracuse for "rehabilitation maintenance" and to receive reimbursement for her travel expenses to the YMCA.

7.      On August 31, 2017, PARNELL was indicted by a federal grand jury for violations of Title 18, United States Code, Section 1343 and Title 18, United States Code, Section 641. The indictment (attached as Exhibit 1) outlines the details of my investigation into PARNELL's fraudulent YMCA travel reimbursement claims.  Between January 2010 and August 2016,

PARNELL filed 1,737 claims to OWCP for round-trip mileage from her home to the YMCA. However, YMCA membership card scans for this time period showed only 81 total visits for PARNELL. YMCA representatives have asserted that no one is allowed entry to their facilities without first presenting and scanning a membership card. In the event the member wishing to gain entry does not have their card, each facility must ensure the individual is a member via their computer system and log the member's entry manually. The entry by the employee will show as a card scan. Additionally, the YMCA is known to be closed for five major holidays including Easter, Memorial Day, Independence Day, Labor Day and Christmas. PARNELL filed reimbursement claims for roundtrip travel to the YMCA for Easter 2012, 2014 and 2015; Memorial Day 2013, 2015 and 2016; Independence Day 2011, 2013, 2014 and 2015; Labor Day 2012, 2013, 2014 and 2015; and Christmas Day 2013.

8.      During her interview, PARNELL admitted that she submitted claims for visits to YMCA of Greater Syracuse branches while visiting her brother in Pennsylvania. She also stated she filed claims for YMCA visits when actually visiting Planet Fitness and when taking walks or biking in local parks.

9.      PARNELL is currently active on social media sites. I have personally viewed Facebook posts by PARNELL depicting day trips and vacations that directly conflict or possibly conflict with her claimed YMCA visits. These include a June 24, 2016 trip to NY Zipline Adventures at Hunter Mountain, NY and an August 9, 2014 trip to Dexter, NY for Whitewater Rafting. I believe the information posted and provided by PARNELL to and subsequently stored by Facebook, Inc. will corroborate PARNELL's fraud in, at a minimum, circumstantially substantiating dates, times, and locations where she was doing activities that conflict with claimed reimbursement claims. In other words, having reviewed publicly available data on PARNELL's

Facebook page, I believe there is probable cause that other information, including metadata, associated with the account will underscore and substantiate the fraud she committed on the VA because she could not be two places at once and may not have been physically and/or realistically able to make the drives she claims to have made to the YMCA on certain dates from certain locations.

10.     As a result of the aforementioned fraudulent travel claims, PARNELL received $72,207.16 from OWCP to which she was not entitled.

## FACEBOOK

11.     PARNELL maintains a personal Facebook account under the name "Lindasue Parnell." This account appears to be public.

12.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

13.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

14.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual

Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

15.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

16.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

17.    Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

18.    Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

19.    If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

20.    Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

21.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

22.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

23.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

24.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

25.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

26.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

27.     Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the

group, who can invite new members and reject or accept requests by users to enter.  Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group.  Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

28.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile.  The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

29.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

30.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may

communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

31.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and

Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

32.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

### INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

33.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

34.     Because the requested search warrant will be served on Facebook, which will then compile the requested records and information at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

### CONCLUSION

35.     Based on the above information, I request that the Court issue the proposed search warrant.

36.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

Douglas Herbert
Special Agent
VAOIG

Subscribed and sworn to before me on _Aug 17_, 2018.

Hon. Thérèse Wiley Dancks
United States Magistrate Judge

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Criminal No.   5:17-CR-$240 (DNH)$ |
| | ) | |
| **v.** | ) | **Indictment** |
| | ) | |
| **LINDA SUE PARNELL,** | ) | Violations:   18 U.S.C. § 1343 |
| | ) | [Wire Fraud] |
| | ) | 18 U.S.C. § 641 |
| | ) | [Theft of Government Money] |
| | ) | |
| | ) | 5 Counts & Forfeiture Allegation |
| | ) | |
| **Defendant.** | ) | County of Offense:   Onondaga |

## THE GRAND JURY CHARGES:

### Introduction

1.     On or about September 3, 1995, Defendant **LINDA SUE PARNELL** ("**PARNELL**"), while working as a nurse at a Veterans Affairs hospital, injured her back while assisting a patient.

2.     Following her injury, Defendant **PARNELL** was approved to receive compensation benefits relating to her injury from the U.S. Department of Labor Office of Workers' Compensation Programs ("OWCP"), a department and agency of the United States.

3.     OWCP specifically authorized Defendant **PARNELL** to obtain a membership to the Young Men's Christian Association ("YMCA") of Greater Syracuse for "rehabilitation maintenance." Pursuant to that authorization, OWCP reimbursed Defendant **PARNELL** for the cost of her membership to the YMCA of Greater Syracuse and for any travel to and from a branch of the YMCA of Greater Syracuse.

4.      After OWCP authorized her receipt of benefits, Defendant **PARNELL** submitted Medical Travel Refund Request forms to OWCP for travel to and from the YMCA of Greater Syracuse, as well as for travel to and from medical appointments.

5.      Defendant **PARNELL** signed each one of those Medical Travel Refund Request forms pursuant to a Payee's Certification that stated: "I hereby certify that the information given by me on and in connection with this form is true and correct to the best of my knowledge and belief. I am aware that any person who knowingly makes any false statement or misrepresentation to obtain reimbursement from OWCP is subject to civil penalties and/or criminal prosecution."

### The Scheme to Defraud

6.      The allegations set forth in paragraphs 1 through 5 above are hereby incorporated by reference as if fully set forth herein.

7.      From on or about January 2, 2010 until on or about August 30, 2016, in Onondaga County in the Northern District of New York, the defendant,

### LINDA SUE PARNELL,

devised and intended to devise a scheme and artifice to defraud OWCP, and to obtain money by means of materially false and fraudulent pretenses, representations, and promises, by submitting Medical Travel Refund Request forms to OWCP with false, fraudulent, and misleading information concerning the defendant's entitlement to reimbursement for travel to and from branches of the YMCA of Greater Syracuse.

8.      It was part of the scheme and artifice to defraud that Defendant **PARNELL** submitted Medical Travel Refund Request forms to OWCP stating that Defendant **PARNELL** had traveled round trip from her home to a branch of the YMCA of Greater Syracuse, when, as she then well knew, she did not visit a branch of the YMCA of Greater Syracuse. From 2010 through

2

August 2016, Defendant **PARNELL** submitted claims to OWCP stating that she had visited branches of the YMCA of Greater Syracuse hundreds of times, but she had actually visited a branch of the YMCA of Greater Syracuse a small fraction of those times.

9.      It was further part of the scheme and artifice to defraud that Defendant **PARNELL** overstated the distance she traveled from her home to and from a branch of the YMCA of Greater Syracuse.  On the Medical Travel Refund Request forms Defendant **PARNELL** submitted to OWCP, Defendant **PARNELL** claimed that she drove seventy-five (75) miles while traveling to and from the YMCA from her home, when, in fact, the roundtrip distance from Defendant **PARNELL**'s home to any of the branches of the YMCA of Greater Syracuse was less than forty (40) miles.  Moreover, on a majority of the occasions that Defendant **PARNELL** actually went to a branch of the YMCA of Greater Syracuse, Defendant **PARNELL** visited the Onondaga Community College branch of the YMCA of Greater Syracuse, which is approximately six (6) miles from Defendant **PARNELL**'s house.

10.      It was further part of the scheme and artifice to defraud that Defendant **PARNELL** made inflated claims to OWCP for travel reimbursement for medical appointments.  From in or about January 2010 through in or about June 2016, Defendant **PARNELL** submitted claims for travel to and from medical appointments, but over time, Defendant **PARNELL** increased the number of miles she claimed she traveled for a medical appointment, even though Defendant **PARNELL** traveled to the same medical provider from her same home address.

11.      As a result of the scheme and artifice to defraud, Defendant **PARNELL** received more than $72,000 from OWCP for travel to and from a branch of the YMCA of Greater Syracuse that she was not entitled to receive.

3

COUNTS 1-4
[Wire Fraud]

12.     The allegations set forth in paragraphs 1 through 11 above are hereby incorporated by reference as if fully set forth herein.

13.     On or about the following dates, each date constituting a separate count of this Indictment, in the Northern District of New York, the defendant, **LINDA SUE PARNELL**, for the purpose of executing the scheme and artifice to defraud described above, caused to be transmitted by means of wire communication in interstate commerce the following writings, signs and signals, that is, electronic funds transfers from the United States Federal Reserve in Atlanta, Georgia to an Empower Federal Credit Union account with a member number ending in 604 held by Defendant **PARNELL** in Syracuse, New York:

| COUNT | DATE | AMOUNT OF WIRE TRANSFER | SENDING ACCOUNT | RECEIVING ACCOUNT |
|-------|------|-------------------------|-----------------|-------------------|
| 1 | July 11, 2013 | $381.47 | United States Federal Reserve | Empower Federal Credit Union |
| 2 | July 17, 2014 | $1,176.00 | United States Federal Reserve | Empower Federal Credit Union |
| 3 | June 11, 2015 | $388.17 | United States Federal Reserve | Empower Federal Credit Union |
| 4 | June 16, 2016 | $324.00 | United States Federal Reserve | Empower Federal Credit Union |

In violation of Title 18, United States Code, Section 1343.

4

## COUNT 5
### [Theft of Government Money]

14.     The allegations set forth in paragraphs 1 through 11 above are hereby incorporated by reference as if fully set forth herein.

15.     From on or about January 2, 2010 through on or about August 30, 2016, in Onondaga County in the Northern District of New York, the defendant, **LINDA SUE PARNELL**, willfully and knowingly did steal and purloin to her own use money of the United States and a department and agency thereof and the value of such property was more than $1,000, that is Defendant **PARNELL** obtained approximately $72,207.16 from OWCP when, as she then well knew, she was not entitled to such benefits because she had not traveled from her home to, and visited, a branch of the YMCA of Greater Syracuse when she claimed she had, and when, as she then well knew, she overstated the distance she traveled from her home to and from a branch of the YMCA of Greater Syracuse, in violation of Title 18, United States Code, Section 641.

### FORFEITURE ALLEGATION

As a result of committing the offenses alleged in Counts 1 through 5 of this Indictment, which are realleged and incorporated by reference as if fully set forth here, Defendant **LINDA SUE PARNELL** shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, relative to the offenses of conviction, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1343 (wire fraud) or 18 U.S.C. § 641 (theft of government money).

The intent of the United States of America to forfeit such property includes, but is not limited to:

    a.  A money judgment in the amount of $72,207.16

If any of the property describe above as being subject to forfeiture, as a result of any act or omission of the defendant:

    a.  cannot be located upon exercise of due diligence;

    b.  has been transferred or sold to, or deposited with, a third party;

    c.  has been placed beyond the jurisdiction of the court;

    d.  has been substantially diminished in value; or

    e.  has been commingled with other property which cannot be divided without difficulty,

it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the forfeiture judgment.

Dated:    August 31, 2017

A TRUE BILL,    **NAME REDACTED

Grand Jury Foreperson

GRANT C. JAQUITH
Acting United States Attorney

By:    Robert S. Levine
Assistant United States Attorney
Bar Roll No. 519896